UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **NICHOLAS GIOVINO,** | ) |
| **Plaintiff,** | ) ) ) Civil Action Number |
| v. | ) **2:20-CV-01621-AKK** ) |
| **CITY OF GARDENDALE,** | ) ) |
| **Defendant.** | ) ) |

# MEMORANDUM OPINION AND ORDER

Nicholas Giovino claims that Gardendale City Jail dispatchers, consistent with a municipal policy or custom, placed him in isolation and deliberately ignored his medical needs after he alerted them to a worsening infection. *See* doc. 1-1. The City of Gardendale moves for summary judgment, arguing that Giovino's 42 U.S.C. § 1983 claim must fail in the absence of a City policy or custom causing any constitutional violation. Doc. 22 at 2. The City also asserts immunity against Giovino's state-law claim. *See id.* As explained herein, the court will deny the motion as to the § 1983 claim but grant the motion as to the state-law claim.

**I.**

Under Federal Rule of Civil Procedure 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." FED. R. CIV. P. 56(a). Summary judgment

is due "if the movant shows that there is no genuine dispute as to any material fact." *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the nonmovant must then establish a genuine issue for trial, meaning "that a reasonable jury could return a verdict for the nonmoving party." *Catrett*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

At this stage, the court construes the evidence and reasonable inferences arising from it most favorably to the nonmovant. *Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020). "And if a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment." *Id.* But "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

## II.

Giovino "noticed a bump on his right foot" a few weeks after he was booked into the Jail. Docs. 22 at 2; 28 at 6. A Jail dispatcher, believing Giovino had "a spider bite," facilitated a medical furlough to UAB Medicine. *Id.*; doc. 21-3 at 1. At UAB, Giovino "present[ed] with what appear[ed] to be tinea of the right foot," and because he told a doctor that he experienced "recurrent" athlete's foot, the doctor opted to "treat [it] as such." Doc. 21-3 at 3. Giovino received an anti-fungal cream that he used for at least one week. *See* doc. 21-2 at 13–14.

Sometime after returning to the Jail, Giovino noticed "two more bumps on his foot" that were "leaking pus" and began to have trouble walking. Docs. 21-2 at 12, 27; 22 at 3; 28 at 6. Giovino asked a Jail dispatcher for bandages but apparently did not receive any.[1] Doc. 21-2 at 28. Giovino then requested to see a paramedic or to talk to another dispatcher, but the dispatcher declined and placed Giovino in a "medical observation cell" away from other inmates. *Id.* at 27–28. Giovino asked another dispatcher for medical attention, but she "shrugged [him] off and said that she would help as much as she could, but that[] [was] all she could do." *Id.* at 28. Around November 17, 2019, while in the isolated cell, Giovino told a dispatcher that he thought he had a staph infection because, according to Giovino, another detainee who had been near him—John Early—had also had a staph infection, was placed in medical observation for a few days without recovering, and had sores that resembled Giovino's. *Id.* at 12–13, 27–28. Giovino claims that the City routinely places detainees with medical needs in isolation without medical care in observation cells that are "euphemism[s]" for disciplinary solitary confinement. *See* doc. 28 at 4.

After about four days, Giovino "felt like if [he] stayed in isolation, [he] was going to die," and he intentionally cut his head to prompt paramedics to arrive. Doc.

---

[1] Giovino's complaint alleges that one or two dispatchers eventually brought him bandages or wraps, *see* doc. 1-1 at 4, but neither he nor the City supports this with testimony or other evidence. During his deposition, Giovino testified that he asked a dispatcher for bandages just before dispatchers placed him in a "medical observation cell" and that the dispatcher in question "basically told [him] no." Doc. 21-2 at 28.

3

21-2 at 13, 17.  The paramedics became "aghast[]" upon seeing Giovino's foot, *id.* at 13, and Giovino subsequently returned to UAB for a possible staph infection.  *See* doc. 21-4 at 1.  During this visit, Giovino "present[ed] with abscesses to the right arch of the foot and surrounding cellulitis" and "ha[d] a lactic acidosis."  *Id.* at 3.  The doctor noted "sepsis" as a "[c]ritical condition[] addressed for impending deterioration" and diagnosed Giovino with a right foot infection, a suspected staph infection, a history of intravenous drug abuse, right foot pain, and sepsis.  *Id.* at 4.  The doctor put Giovino on antibiotics and, due to Giovino's prior drug use and lactic acidosis, transferred him to St. Vincent's out of concern "for [an] underlying infection (endocarditis with embolic episodes)."[2]  *Id.* at 3–5.

St. Vincent's records indicate that Giovino "[had a] [l]ikely MRSA infection of the foot," and he received vancomycin and cefazolin "to cover strep species."  Doc. 21-5 at 4.[3]  St. Vincent's provided "[r]outine wound care for the open sores," checked for drainage and abscesses,[4] and "order[ed] an echo to evaluate for possible endocarditis."  *Id.*  Giovino remained at St. Vincent's for two days, until the sores

---

[2] UAB records also indicate that prior to transfer, Giovino's condition was "[s]table" but constituted a medical emergency.  *Id.* at 4 (answering "Yes" to the prompt "Medical Emergency").

[3] Giovino testified that a doctor at St. Vincent's diagnosed him with sepsis and MRSA.  Doc. 21-2 at 28–29.

[4] The parties agree that Giovino's ultrasound returned "negative for abscess" and that his blood cultures did not reveal infection-causing bacteria, *see* docs. 22 at 4–5; 26 at 7, but Giovino points out that these tests occurred following three days of antibiotics, doc. 26 at 7.

4

were "well defined, closed [and] in various stages of healing." *See id.* at 13. According to Giovino, a doctor at St. Vincent's said that he would have MRSA or staph for the rest of his life and that if he had received proper care "in the beginning," the infection "probably would never have developed into MRSA." *Id.* at 30.

### III.

Giovino claims that the City's policy or custom of isolating detainees with serious medical needs in cells without medical care caused his injuries and violated the Fourteenth Amendment and § 1983. *See* doc. 1-1. He also claims that the City is liable for its dispatchers' negligence in causing his infection to worsen.[5] *See id.*

### A.

The Eighth and Fourteenth Amendments impose duties on prison and jail officials to "provide humane conditions of confinement," including "adequate food, clothing, shelter, and medical care." *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Patel v. Lanier Cnty., Ga.*, 969 F.3d 1173, 1188 (11th Cir. 2020). To impose § 1983 liability on the City for violations of these duties, Giovino must show that (1) "his constitutional rights were violated," (2) the City "had a custom or policy that constituted deliberate indifference to that constitutional right," and (3) "the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th

---

[5] The court dismissed Giovino's claims against the three Jail dispatchers he sued individually, *see* doc. 1-1, when Giovino failed to serve them after multiple extensions, *see* doc. 9.

Cir. 2004); *see Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007); *Jackson v. Corizon Health, Inc.*, No. 20-14737, 2022 WL 303288, at *4 (11th Cir. Feb. 2, 2022). And to establish the underlying constitutional violation, Giovino must prove "(1) that he had an objectively 'serious medical need,' (2) that [the dispatcher(s)] acted with subjective 'deliberate indifference to [that] serious medical need,' and (3) that he suffered an "injury . . . caused by [that] wrongful conduct." *See Patel*, 969 F.3d at 1188; *Jackson*, 2022 WL 303288, at *4. The City argues that Giovino fails to show a serious medical need, the dispatchers' deliberate indifference, or a causal link between this alleged misconduct and a City policy or custom. *See* doc. 22.

1.

"A medical need that is serious enough to satisfy the objective component 'is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Goebert*, 510 F.3d at 1326. In either case, the medical need, "if left unattended, poses a substantial risk of serious harm." *Patel*, 969 F.3d at 1188.

Giovino's testimony and medical records illustrate that doctors at UAB and St. Vincent's diagnosed him with sepsis and a likely MRSA or staph infection after open sores developed on Giovino's foot. *See* docs. 21-2 at 28–29; 21-4 at 1, 3–5; 21-5 at 4. Doctors treated him with antibiotics, and one doctor characterized his condition as a medical emergency. *See* docs. 21-4 at 3–5; 21-5 at 4. This evidence

belies the City's contention that Giovino lacks documents indicating a serious medical condition. *See* doc. 22 at 4–5. And though the City maintains that "[Giovino] has provided no testimony from any medical treating providers" on this point, *id.* at 8, the City fails to explain why the records noting the doctors' beliefs that Giovino had an infection requiring intravenous antibiotics are insufficient.[6] On the contrary, this evidence and inferences arising from it could lead a factfinder to determine that Giovino was experiencing an objectively serious medical need before paramedics eventually took him for treatment. *See Patel*, 969 F.3d at 1188.

2.

"A defendant is deliberately indifferent to a plaintiff's serious medical need when he [or she] '(1) ha[s] subjective knowledge of a risk of serious harm; (2) disregard[s] that risk; and (3) act[s] with more than gross negligence.'" *Patel*, 969 F.3d at 1188 (quoting *Harper v. Lawrence Cnty.*, 592 F.3d 1227, 1234 (11th Cir. 2010)). "Whether a particular defendant has subjective knowledge of the risk of serious harm is a question of fact" that can be answered through "inference from circumstantial evidence," and a factfinder can conclude that staff "knew of a substantial risk from the very fact that the risk was obvious.'" *Goebert*, 510 F.3d at

---

[6] The City attempts to cast doubt on Giovino's purported infection by citing Early's testimony that Early did not tell Jail staff he had a staph infection after his release and suggesting that Early did not infect Giovino. *See* doc. 30 at 2. But Early also testified that he "did have inflammatory symptoms going on" and "was hurting," doc. 21-6 at 28–29, and the court questions the salience of this point on Giovino's purported medical condition.

7

1327. When a detainee allegedly "suffered increased physical injury due to the delay [in care]," the court considers "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." *Id.*

Giovino testified that he told at least two dispatchers that his sores had grown worse following a brief medical visit for what one dispatcher considered an insect bite. To be sure, an apparent insect bite may not raise great alarm. But, considering that Giovino later alerted dispatchers to the visibly deteriorating condition of his foot and asked them to see a paramedic, these dispatchers were aware of what appeared to be a worsening infection. And, according to Giovino, the dispatchers declined to provide care, including by supplying bandages or having paramedics evaluate his foot.[7] Rather, the dispatchers isolated Giovino in a medical observation cell, which included neither medical care nor observation. After several days and pleas, Giovino took matters into his own hands and gashed his head open to prompt a visit from paramedics—who, despite the head injury, immediately had Giovino taken to a hospital for his foot. Doctors then diagnosed him with at least one infection and placed him on intravenous antibiotics for several days.

This evidence, if credited, could lead to the reasonable inference that Jail dispatchers (1) knew Giovino suffered from a medical need requiring professional

---

[7] Again, Giovino's pleadings suggest at least one dispatcher bandaged his foot, *see* doc. 1-1- at 4, but the parties do not cite related testimony or argue that this dooms his claim.

evaluation, (2) ignored his requests over several days, (3) may have continued to ignore his condition had he not taken a drastic measure, and (4) possibly permitted his condition to worsen. Accordingly, Giovino has raised a genuine dispute as to the dispatchers' deliberate indifference, and because the City does not challenge whether this indifference caused his injury, Giovino may reasonably establish an underlying constitutional violation at trial. *See Patel*, 969 F.3d at 1188.[8]

3.

Having arguably established a constitutional violation, to defeat the City's motion, Giovino must identify and causally connect a municipal policy or custom to his constitutional injury. *See Goebert*, 510 F.3d at 1326; *Cuesta v. Sch. Bd. of Miami-Dade Cnty., Fla.*, 285 F.3d 962, 967 (11th Cir. 2002). "Because municipalities rarely have an official policy that endorses a constitutional violation, [Giovino] 'must show that [the City] ha[d] a custom or practice of permitting it and that [the City's] custom or practice [was] 'the moving force [behind] the constitutional violation.''" *See Craig v. Floyd Cnty., Ga.*, 643 F.3d 1306, 1310 (11th

---

[8] The City claims that Giovino fails to show Jail staff knew of his medical need because the dispatchers would not have been able to identify an infection caused by common MRSA bacteria. Doc. 30 at 4. These assertions do not rebut Giovino's testimony, which, if believed, establishes that he had visible, deteriorating sores that hindered his mobility and that he told dispatchers about his worsening condition and suggested it was an infection. And rather than citing differences in medical opinion or treatment options, Giovino maintains that the dispatchers ignored his requests and failed to bring in paramedics who could have provided medical opinions or treatment. *See* doc. 21-2 at 27–28. Of course, if the evidence at trial suggests that dispatchers did respond to Giovino's medical needs, albeit not as Giovino specifically requested, *see* doc. 1-1 at 4, this may undermine his claim. But at this stage, Giovino's testimony raises a genuine issue on this point.

Cir. 2011). Proof of a single incident will not suffice; rather, a "pattern of similar constitutional violations . . . is 'ordinarily necessary.'" *Id.*

Giovino primarily asserts that the City has a "policy, custom, and practice of simply isolating inmates when they need[] medical attention as opposed to getting them medical attention." Doc. 28 at 13. To buttress this claim, he cites his own experiences at the Jail and those of Early, the fellow detainee whom Giovino says dispatchers isolated in an observation cell in lieu of providing medical care. *See id.* (citing doc. 21-2 at 29). Giovino specifically testified that he witnessed Early "complaining of medical needs" before Early was "put into isolation as opposed to being medically attended to" and that dispatchers returned Early to the Jail's general population only after Early falsely "told them he felt better" to get out of "complete isolation." Doc. 21-2 at 29. For his part, Early testified in his own lawsuit against the City that dispatchers indeed placed him in an isolated cell where he received no evaluations or treatment and that "[e]very jailer at that jail knew the condition of [his] foot" because "[he] brought it to their attention." Doc. 21-6 at 27.

The City, citing testimony from one dispatcher, acknowledges that detainees may be placed in isolation cells due to medical conditions and "to facilitate medical treatment of [those] condition[s] by the fire department" as a matter of course. Doc. 30 at 5 (citing doc. 28-1). This is virtually the only evidence the City cites in response to Giovino's assertions that the Jail routinely places detainees in isolation

10

for medical conditions without providing care. *See generally* docs. 22; 30. And in fact, this evidence undermines the City's own contention that no municipal policy or custom caused Giovino's constitutional injury. While a single incident of deliberate indifference may not establish a municipal custom, *Craig*, 643 F.3d at 1310, Giovino's and Early's testimony, coupled with the City's acknowledgement, suffices at this stage to raise a genuine dispute. Because this purported practice led Giovino to stay in isolation without treatment as his infection apparently worsened, summary judgment is improper on Giovino's § 1983 claim.

B.

The City is correct, however, that it is immune from liability for Giovino's state-law claim because Giovino fails to argue that the dispatchers behaved negligently as opposed to recklessly or intentionally.[9] By statute, Alabama municipalities cannot be liable "for damages or injury done to or wrong suffered by any person . . . , unless such injury or wrong was done or suffered through neglect, carelessness, or unskillfulness of some agent, officer, or employee of the municipality . . . ." ALA. CODE § 11-47-190. Accordingly, Alabama law "limits the liability of a municipality to negligence." *Town of Loxley v. Coleman*, 720 So. 2d

---

[9] The Eleventh Circuit has underscored that "the deliberate indifference standard . . . is in fact akin to subjective recklessness as used in the criminal law." *See Swain v. Junior*, 961 F.3d 1276, 1288 (11th Cir. 2020) (internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 839–40; *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013)).

11

907, 909 (Ala. 1998). While allegations of neglect are not necessarily inconsistent with intentional-sounding torts like assault and false arrest, for example, *see Borders v City of Huntsville*, 875 So. 2d 1168, 1183 (Ala. 2003), Giovino cites and substantiates only reckless or willful conduct by the dispatchers: that, despite his pleas, the dispatchers deliberately neglected him. Because the City cannot be vicariously liable for intentional or wanton misconduct, *see Brown v. City of Huntsville*, 608 F.3d 724, 743 (11th Cir. 2010); *Coleman*, 720 So. 2d at 909, the City cannot be liable for this claim, even if pleaded as "negligence."[10] *See Fowler v. Meeks*, 569 F. App'x 705, 708 (11th Cir. 2014) (dismissing at the pleadings stage a negligence claim against a municipality because the plaintiff "alleged acts that constitute[d] more than negligence [and] . . . show[ed] deliberate actions akin to intentional torts").

## IV.

In sum, the City's motion for summary judgment, doc. 22, is **GRANTED IN PART**, namely, only as to Giovino's negligence claim. This claim is **DISMISSED**

---

[10] Further weakening Giovino's negligence claim is his near lack of opposition to the City's assertion of immunity. Giovino's two-sentence response to the City's assertion consists of (1) an excerpt of § 11-47-190 and (2) a conclusory statement that "[his] claims are replete with just the allegations that the statute addresses, namely, the 'neglect' he experienced . . . and the 'carelessness and unskillfulness' of the defendants . . . ." Doc. 28 at 22–23. Giovino does not, for instance, address his testimony that dispatchers deliberately declined to get him medical treatment despite his requests and his visible condition or point to evidence suggesting the dispatchers' negligent, as opposed to willful, state of mind.

**WITH PREJUDICE**.  The motion is **DENIED** as to Giovino's § 1983 claim.  This matter is **SET** for an initial settlement conference at noon on July 8, 2022.

**DONE** the 30th day of June, 2022.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE